Edwin A. Gallun and Jane W. Gallun (Husband and Wife) v. Commissioner. A. F. Gallun & Sons Corporation v. Commissioner.
Gallun v. Commissioner
Docket Nos. 71146, 72160, 77038.
United States Tax Court
T.C. Memo 1960-104; 1960 Tax Ct. Memo LEXIS 186; 19 T.C.M. (CCH) 555; T.C.M. (RIA) 60104; May 26, 1960
*186 Richard S. Gibbs, Esq., for the petitioners. Delman H. Eure, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion In these consolidated cases the respondent has determined deficiencies in Federal income taxes against the corporate petitioner in Docket Nos. 72160 and 77038 for the fiscal years ended September 30, 1954, 1955, and 1956 in the respective amounts of $36,378.48, $244.36, and $6,139.81, and in Docket No. 71146 against the individual petitioners for the calendar year 1954 in the amount of $54,589.70. Those parts of the deficiencies are here in issue which result from respondent's disallowance of deductions for amortization of bond premiums claimed by the corporate petitioner for the fiscal years 1954 and 1955 in the respective amounts of $37,762.33 and $9,635.88, and a similar deduction claimed by the individual petitioners for 1954 in the sum of $42,875, and from his disallowance of deductions for charitable contributions claimed by the corporate petitioner for the fiscal years 1954, 1955, and 1956 in the respective amounts of $15,460.51, $12,870.03, and $11,807.33, and of a similar deduction claimed by the individual petitioners for *187 1954 in the amount of $35,009.92. Findings of Fact The parties have filed herein a stipulation of facts. We find the facts to be as stipulated and incorporate herein by this reference the stipulation, together with the exhibits attached thereto. Petitioner, A. F. Gallun & Sons Corporation, is a Wisconsin corporation having its offices and principal place of business at 1818 North Water Street, Milwaukee, Wisconsin. The corporation is engaged in the business of tanning high-grade calf leather. It filed corporate income tax returns for its fiscal years ended September 30, 1954, 1955, and 1956 with the district director of internal revenue at Milwaukee, Wisconsin. Petitioners, Edwin A. Gallun, sometimes hereinafter referred to as Gallun, and Jane W. Gallun, during 1954 were husband and wife and resided at Chenequa, Wisconsin. They filed a joint Federal income tax return for the taxable year 1954 with the district director of internal revenue at Milwaukee, Wisconsin. During 1954, 1955, and 1956 Edwin was president and controlling stockholder of the Gallun Corporation and president and treasurer of the Gallun Foundation, Inc. Gallun was interested in the welfare of various charities *188 and particularly of the Milwaukee Y.M.C.A. The Gallun Foundation, Inc., is a corporation organized under the laws of Wisconsin for the purpose of receiving gifts and contributing them to charitable enterprises. During the years in question it was exempt from Federal income tax and contributions to the foundation were deductible by the donors for Federal income tax purposes. The foundation's offices were located at the offices of the Gallun Corporation and all of its officers were employed by or otherwise associated with the corporation. It had no paid employees and all of its work was handled by regular employees of the corporation. The foundation held no regular periodic meetings other than an annual meeting. Lawrence W. Snell Company is a registered dealer in securities, primarily bonds. It was organized in 1954 and at that time had no more than 6 employees. The founder and principal member of the firm was Lawrence W. Snell. Gallun and Snell met socially in 1948 or 1949. Since that time and during the period in question their acquaintance has been primarily social. In the latter part of 1953 or early part of January 1954 Snell outlined to Gallun a plan involving the purchase *189 at a premium of callable bonds. Snell told Gallun that it was possible under the Federal income tax laws to amortize the premium on these bonds, some of which were excellent, to their earliest call date and then either sell them and take a capital gain or donate them to charity and obtain charitable deductions. This type of program was also explained by Snell to other possible customers and he solicited this kind of business for the Snell Company, which would handle the purchase and sale of the bonds. Snell maintained lists of some of these callable bonds which were available to him and which could be used for these purposes. On several occasions Snell discussed the attributes of such bonds with Gallun in suggesting to him the bonds to be purchased. From time to time the Snell Company carried inventories of callable public utility bonds, some of which it sold, repurchased, and sold again. During 1954 and 1955 Gallun, for himself or for the Gallun Corporation, purchased and disposed of various quantities of 5 different public utility bonds pursuant to the plan outlined to him by Snell. The initial decisions regarding each transaction involving these bonds were made by Gallun and *190 he handled all arrangements regarding their financing. On January 13, 1954, the Snell Company purchased for Gallun and the Gallun Corporation, each, $200,000 face value first mortgage 4 per cent, 1983 Series, Louisiana Power and Light Company bonds. The market price of the bonds on that date was 111 3/4. The net amount paid for the bonds purchased for Gallun and the Gallun Corporation was $227,566.67, each, which included a principal amount of $223,500, accrued interest of $3,066.67, and a commission of $1,000. These Louisiana Power bonds were part of an original issue of September 1, 1953, all of which were callable on 30 days' notice for current sinking-or improvement-fund to August 31, 1954, at 100.75. Sinking-or improvement-fund provisions require that annually, beginning in 1954, 1 per cent of the greatest amount of this series issued should be retired. They were also callable at the option of the issuer on similar notice to August 31, 1954, at 103.75. On January 18, 1954, Gallun and the Gallun Corporation each executed a check payable to the Marshall & Ilsley Bank, sometimes hereinafter referred to as the bank, of Milwaukee, Wisconsin, in the amount of $22,000. On the same *191 date each executed a note payable to the bank in the amount of $205,566.67. The proceeds of these two checks and two notes totaling in each case $227,566.67 were used by the bank to pay the purchase price of the Louisiana Power bonds. The Louisiana Power bonds were cleared through the Chemical Bank & Trust Company of New York which sent two sight drafts to the Marshall & Ilsley Bank for the accounts of Gallun and the Gallun Corporation to cover their purchase price. The Louisiana Power bonds purchased by Gallun and the Gallun Corporation were pledged as collateral security for payment of their respective notes dated January 18, 1954. The notes were each due 60 days after date on March 19, 1954, with interest at the rate of 3 3/4 per cent. Gallun's note was renewed on March 19, 1954, by the execution of a new note. The corporation's note was renewed on March 19 and July 19, 1954, by the execution of two new notes. On February 10, 1954, Gallun sent a letter to Snell which stated: "I have your invoices of February 2 totalling $160.70 each additional fees to myself and to the A. F. Gallun and Sons Corporation, with regard to the two purchases of $200,000.00 each Louisiana Power *192 and Light Company 4's of 1983 bonds. "I am enclosing checks to cover these charges. "I should like to question at this time the validity of your double commission on these transactions. I of course had no objection to these as long as the information and research on which purchase was based seemed to be bringing results, but under the circumstances of these transactions I wonder whether you would consider this double charge to be justified? "The Corporation it seems to me is about to lose approximately half of its equity, and I personally will lose a substantial sum unless I carry through for an additional five months, in which case I might split even or nearly so, but of course this extra five months is hardly justified by its bringing me back the three thousand or so that I would otherwise lose. The above assumptions are based upon the amortization being allowed on these deals as a deduction from income. If the disallowance of the amortization should be made retroactive there would of course be practically no salvage for the Corporation, and very little for myself, excepting for a small amount of capital gains on other profitable transactions which could be offset against these *193 losses. It is hardly reasonable to give this transaction credit however for other profits, and the saving in any case would be very slight." On August 17, 1954, Gallun and the Gallun Corporation each sent a letter to the Gallun Foundation which stated: "This letter hereby conveys to you all of the undersigned's interest and equity in those two hundred (200) One Thousand Dollar ($1000.00) par value four percent (4%) 1st Mortgage bearer bonds of 1983 of Louisiana Power and Light Company presently in the possession of the Marshall & Ilsley Bank, Milwaukee, Wisconsin, as security for a note of the undersigned dated January 19, 1954. This gift of the aforesaid bonds subject to the indebtedness is made for your charitable purposes. It is the condition of this gift that the aforesaid note of the undersigned will be assumed or satisfied by you so that the undersigned will be released from further obligation thereon." On August 17, 1954, Gallun and the Gallun Corporation each sent a letter to the bank authorizing it to deliver their entire interest and equity in the Louisiana Power bonds to the foundation and stating that it was understood that the notes for which the bonds were pledged *194 as collateral security would be assumed or satisfied by the foundation and that Gallun and the corporation would be released from further obligation on the note. On August 17, 1954, the foundation executed a note to the bank in the amount of $403,133.34, due 30 days after date on September 16, 1954, with interest at the rate of 3 per cent per annum. The Louisiana Power bonds which had been transferred to the foundation were pledged as collateral security for payment of the note. The foundation's note was executed in satisfaction of and substitution for the January 18, 1954, notes, as renewed, of Gallun and the Gallun Corporation which were marked paid as of August 18, 1954. On August 18, 1954, the Snell Company sold the $400,000 Louisiana Power bonds for the foundation. The market price of the bonds on that date was 104. The net sale price was $422,488.89, which included the principal amount of $416,000, plus $7,688.89 interest, less commission of $1,000 and Federal tax in the amount of $200. On August 24, 1954, the foundation's note payable to the bank was discharged, and on the same day the board of directors of the Gallun Corporation approved the August 17 transfer of its *195 Louisiana Power bonds to the foundation, subject to the corporation's note for which the bonds were pledged as collateral. On October 6, 1954, the board of trustees of the foundation ratified and approved its assumption of the obligations of Gallun and the Gallun Corporation totaling $403,133.34 in connection with the receipt of the Louisiana Power bonds. On August 13, 1954, the Snell Company sold to Gallun and the Gallun Corporation, each, $100,000 face value first mortgage 3 1/4 per cent, 1973 Series, Equitable Gas Company bonds. The market price of the bonds on that date was 108 1/4. The net amount paid for the bonds purchased by Gallun and the Gallun Corporation was $108,683.33, each, which included a principal amount of $108,250 and accrued interest of $433.33. These Equitable Gas bonds were part of an original issue of January 1, 1948, all of which were callable on 30 days' notice for sinking fund to December 31, 1954, at 100.71. Sinking-fund provisions require that annually, beginning January 1, 1949, 1 1/2 per cent of the highest amount of this series issued should be retired. These bonds were also callable at the option of the issuer on similar notice to December 31, 1954, at *196 102.88. On August 19, 1954, Gallun and the Gallun Corporation each executed a check payable to the bank in the amount of $108,683.33. On the same date each executed a note payable to the bank in the amount of $101,000. These checks were used by the bank to pay the purchase price of the Equitable Gas bonds and the notes were credited to the respective checking accounts of Gallun and the Gallun Corporation with the bank. The actual cost of the bonds to Gallun and the corporation was $7,683.33 each. The Equitable Gas bonds were cleared through the Chemical Bank & Trust Company of New York and delivered to the Irving Trust Company of New York which held them for the Marshall & Ilsley Bank accounts of Gallun and Gallun Corporation. The Equitable Gas bonds were pledged as collateral security for the notes executed by Gallun and the Gallun Corporation on August 19, 1954. The notes were each due 45 days after date on October 4, 1954, with interest at the rate of 3 per cent per annum. On September 14, 1954, Gallun and the Gallun Corporation each sent a letter to the Gallun Foundation stating that all of their interest and equity in the Equitable Gas bonds were thereby conveyed to it *197 as gifts subject to the notes for which they were pledged as collateral and upon the condition that the notes would be assumed or satisfied by the foundation. On September 14, 1954, Gallun and the Gallun Corporation each sent a letter to the bank authorizing it to deliver their entire interest and equity in the Equitable Gas bonds to the foundation and stating that it was understood that the notes for which they were pledged as security would be satisfied by the foundation and that Gallun and the corporation would be released from further obligation. On September 14, 1954, the foundation executed a note to the bank in the amount of $202,000, due 45 days after date on October 29, 1954, with interest at the rate of 3 per cent per annum. The Equitable Gas bonds which had been transferred to the foundation were pledged as collateral security for payment of the note. The foundation's note was executed in satisfaction of and substitution for the August 19, 1954, notes of Gallun and the Gallun Corporation, which were marked paid as of September 14, 1954. On September 14, 1954, the Snell Company sold the Equitable Gas bonds in the face amount of $200,000 for the foundation. The market *198 price of the bonds on that date was 111 1/2. The net sale price was $223,326.39, which included the principal amount of $223,000.39, plus $1,426 interest, less commission of $1,000 and Federal tax of $100. The foundation note of September 14, 1954, was paid on September 22, 1954. On October 6, 1954, the board of trustees of the foundation ratified and approved the assumption of the obligations of Gallun and the Gallun Corporation by the foundation in connection with its receipt of the Equitable Gas bonds. On August 18, 1954, the Snell Company sold to Gallun $96,000 face value and to the Gallun Corporation $100,000 face value, first lien, 3 1/4 per cent, 1973 Series, Virginian Railway Company bonds. The market price of the bonds on August 18, 1954, was 108. The net amount paid for the bonds purchased by Gallun was $104,919.33, which included the principal amount of $103,680 and accrued interest of $1,239.33. The net amount paid for the bonds purchased by the corporation was $109,290.97, which included the principal amount of $108,000 and accrued interest of $1,290.97. These Virginian Railway bonds were part of an original issue of October 1, 1948, all of which were callable *199 for sinking fund on any interest date on 30 days' notice (otherwise 60 days), to September 30, 1956, at 100 3/4. Sinking-fund provisions required that annually, as of April 15, 1 1/2 per cent of this series of bonds be redeemed at not in excess of the sinking-fund price. They were also callable at the option of the issuer on similar notice to September 30, 1954, at 102 7/8, and to September 30, 1955, at 102 5/8. Interest dates were April and October 1. On August 23, 1954, Gallun executed a check payable to the bank in the amount of $104,919.33, and the corporation executed a check payable to the bank in the amount of $109,290.97. The following day Gallun executed a note payable to the bank in the amount of $97,000, and the corporation executed a note payable to the bank in the amount of $101,000. These notes were credited to the checking accounts of Gallun and the Gallun Corporation, respectively, and the checks were used to pay the purchase price of the Virginian Railway bonds. The Virginian Railway bonds purchased by Gallun and the Gallun Corporation were pledged as collateral security for their respective notes. The notes were dated August 24, 1954, due 45 days after date with *200 interest at the rate of 3 per cent per annum. The Virginian Railway bonds were cleared through the Chemical Bank & Trust Company and delivered to the Irving Trust Company, which held them for the Marshall & Ilsley Bank, accounts of Gallun and Gallun Corporation. On October 4, 1954, Gallun and the Gallun Corporation sent letters to the Gallun Foundation stating that all of their interest and equity in the Virginian Railway bonds were thereby conveyed to it as gifts, subject to the notes for which they were pledged as collateral and upon the condition that the notes would be assumed or satisfied by the foundation. On the same date Gallun and the Gallun Corporation each sent a letter to the bank authorizing it to deliver their entire interest and equity in the bonds to the foundation, and stating that it was understood that the notes for which they were pledged as security would be satisfied by the foundation and that Gallun and the Gallun Corporation would be released from further obligation. On October 4, 1954, the Snell Company sold on behalf of the foundation Virginian Railway bonds of the face amount of $46,000 for settlement October 8. The market price of these bonds on *201 that date was 108 1/2. The net sale price was $49,686.07, which included the principal amount of $49,910, plus interest of $29.07, less commission of $230 and Federal tax of $23. On October 5, 1954, the foundation executed a note payable to the bank in the amount of $198,000, due 30 days after date on November 4, 1954, with interest at the rate of 3 per cent per annum. The note states that Virginian Railway bonds in the face amount of $196,000 were pledged as collateral security for its payment. The foundation's note was executed in satisfaction of and substitution for the notes of Gallun and the Gallun Corporation which were marked paid as of October 5, 1954. On October 6, 1954, the board of trustees of the foundation ratified and approved the assumption of the obligation by the foundation in connection with the receipt of the Virginian Railway bonds. On October 7, 1954, the Snell Company sold the remaining Virginian Railway Company bonds, in the face amount of $150,000, for the foundation. The market price of the bonds on that date was 108 1/2. The net sale price was $162,114.59, which included the principal amount of $162,750, plus $189.59 interest, less commission of $750 *202 and Federal tax of $75. On October 12, 1954, the board of directors of the Gallun Corporation approved the October 4 transfer of the Virginian Railway bonds to the foundation, subject to the obligation for which they were pledged as collateral, and on October 18, 1954, the foundation note of October 5 was paid. On October 8, 1954, the Snell Company purchased for Gallun $100,000 face value, first mortgage, 3 per cent, 1975 Series, Western Light & Telephone Company bonds. The market price of the bonds on that date was 106 1/2. The net amount paid by Gallun was $107,866.67, which included principal of $106,500, plus accrued interest of $866.67 and commission of $500. These Western Light & Telephone bonds were part of an original issue of July 1, 1945, all of which were callable for sinking fund on 30 days' notice to June 30, 1956, at 101 5/8. Sinking-fund provisions required retirement annually of not less than 1 per cent of the largest amount of these bonds at any one time outstanding. They were also callable at the option of the issuer on similar notice to June 30, 1955, at 104. On October 11, 1954, Gallun sent to the bank a check dated October 14, 1954, payable to the bank *203 in the amount of $6,866.67 and a note dated October 15, 1954, payable to the bank in the amount of $101,000. The proceeds of the checek and note were used by the bank to pay the purchase price of the Western Light & Telephone bonds. The Western Light & Telephone bonds were pledged as collateral security for payment of Gallun's note which was dated October 15, 1954, due 60 days after date on December 14, with interest at the rate of 3 per cent per annum. The Western Light & Telephone bonds were cleared through the Chemical Bank & Trust Company and sent to the Irving Trust Company, which held them for the Marshall & Ilsley Bank, account of Gallun. St. Mark's School of Southborough, Massachusetts, is an educational institution, contributions to which are deductible for Federal income tax purposes. On November 15, 1954, Gallun sent a letter to G. Peabody Gardiner (or Gardner), an officer of the St. Mark's School, stating that Western Light & Telephone bonds in the face amount of $50,000 were being transferred to the school as a gift, subject to a loan of $50,500 from the bank for which they were pledged as collateral. The letter also provided: "These bonds are at present held *204 by the Irving Trust Company of New York City for the Marshall and Ilsley Bank of Milwaukee, Wisconsin (as collateral for the note in my name), and the Marshall and Ilsley Bank will authorize their transfer to the account of St. Marks at once. "I would suggest the immediate sale of these bonds through Lawrence W. Snell Company, 70 Pine Street, New York City, and I will guarantee the school against any possible loss from this transaction for a period of ten days, which should cover the time necessary to complete the sale. "As my purchase price on these bonds was 106 1/2 and I believe that the market on them is still approximately the same, there should be an equity of some $2,000.00 or more accruing to the school after satisfaction of the loan mentioned above." On November 15, 1954, Gallun also sent a letter to the bank authorizing it to convey $50,000 of his interest and equity in the Western Light & Telephone bonds to the St. Mark's School, subject to $50,500 of the note for which they were held as collateral. The letter also provided: "These bonds are given to St. Marks School for educational purposes, and it is a condition of the gift that one-half the loan or $50,500.00 *205 will be assumed or satisfied by them, so that I will be released from this portion of the obligation." On November 15, 1954, the Snell Company sent a letter to Gallun expressing the opinion that the market price of the Western Light & Telephone bonds on that date was 106 and that this figure could be used for tax purposes. The letter also stated that it was understood that the Snell Company would be contacted by the St. Mark's School relative to selling the bonds. On November 17, 1954, the St. Mark's School contacted the Snell Company authorizing it to sell the Western Light & Telephone bonds, in the face amount of $50,000, to the best possible advantage and as soon as reasonably possible. On November 17, 1954, the Snell Company sent a letter to G. Peabody Gardner of St. Mark's School which provided: "Confirming our telephone conversation of today, I enclose herewith copy of letter dictated to me authorizing the Lawrence W. Snell Co. to sell: $50,000
Western Light & Telephone Co.
3s due 1975
"As explained, upon execution of the sale for the account of the St. Marks School, our detailed statement will be mailed to you accompanied by a letter of instructions *206 to the Marshall & Ilsley Bank, Milwaukee, Wisconsin to release the bonds through the Irving Trust Co., New York, N. Y. against payment of $50,500.00, which letter you will probably have signed by the Treasurer, Board of Trustees, St. Mark's School. "When the securities clear, a check payable to the order of the Trustees of the St. Mark's School will be issued for the difference between the payment figure and the proceeds derived from the sale of the securities. "Also enclosed is a copy of the Kiplinger Washington Letter dated September 4, 1954 which publicizes this type of donation - tax saving transaction. "If you wish further information, please do not hesitate to call us." The Milwaukee Hospital is a Wisconsin hospital corporation, contributions to which are deductible for Federal income tax purposes. On November 23, 1954, Gallun sent a letter to the Milwaukee Hospital stating that the remaining Western Light & Telephone bonds, in the face amount of $50,000, were being transferred to it as a gift, subject to the balance, $50,500, of the loan from the bank for which they were pledged as collateral. The remainder of this letter is substantially identical to that informing *207 the St. Mark's School of the transfer of Western Light & Telephone bonds to it. It suggests the immediate sale of the bonds through Snell Company, guarantees the hospital against loss for a period of 10 days, and states that there should be an equity of $2,000 or more accruing to the hospital after satisfaction of the loan. On November 23, 1954, Gallun also sent a letter to the bank authorizing it to convey his entire interest and equity in the remaining Western Light & Telephone bonds, in the face amount of $50,000, to the Milwaukee Hospital, subject to the balance of the note, $50,500, for which they were held as collateral. The letter stated that this transfer was subject to the condition that the balance of the loan would be assumed and satisfied by the hospital so that he would be released from obligation. This letter is substantially identical to that authorizing the bank to transfer one-half of the bonds to the St. Mark's School. On November 29, 1954, the Milwaukee Hospital instructed the bank to authorize the Snell Company to sell the Western Light & Telephone bonds, in the face amount of $50,000, transferred to it, satisfy the note for which they were held as collateral *208 and any other claim of the bank, and deposit any balance to the account of the hospital. On December 3, 1954, the St. Mark's School authorized the bank to sell Western Light & Telephone bonds, in the face amount of $50,000, transferred to it by Gallun. The school stated that it would send the bank a check for any resulting deficit in the note for which they were held as collateral and any interest on the note. The Western Light & Telephone bonds, in the face amount of $50,000, of the St. Mark's School were sold by the bank for a net amount of $50,133.34. This was $585.50 less than the amount owing the bank on the obligation assumed by the school and as interest on the obligation. This deficit was paid to the bank by the school. Although Gallun at that time was not under legal obligation to do so, he made good the loss of St. Mark's School on the transaction by donating to it shares of stock of another corporation which he then owned. The proceeds from the sale of Western Light & Telephone bonds transferred to the Milwaukee Hospital were likewise not sufficient to satisfy the amount owing the bank for which they were pledged as collateral. Gallun made good this loss to the hospital *209 by donating to it 50 shares of stock of another corporation which he then owned. After completion of all the necessary transactions, the hospital had a net gain of $704.60. On May 16, 1955, the Snell Company bought for the Gallun Corporation $100,000 face value, first mortgage, 3 1/8 per cent, 1978 Series, Illinois Power Company bonds. The market price of the bonds on that date was 109. The net amount paid by the corporation was $110,446.18, which included the principal amount of $109,000, accrued interest in the amount of $946.18, and a commission of $500. These Illinois Power bonds were part of an original issue of February 1, 1948, all of which were callable for sinking and property fund, or maintenance and renewal fund on not less than 30 nor more than 60 days' notice, to February 1, 1956, at 100.41. Maintenance- and renewal-fund provisions require deposit annually, on or before April 1, beginning in the year 1943, of $2,000,000, plus a percentage of property additions, such funds to be used to redeem bonds at the company's request for 3 years, and required to be so used after 3 years. They were also callable at the option of the issuer on similar notice, to February 1, 1956, at *210 102.95. On May 18, 1955, the corporation executed a check payable to the bank in the amount of $10,446.18. The following day it executed a note payable to the bank in the amount of $100,000. The check and the note were used by the bank to pay the purchase price of the Illinois Power bonds. These bonds were pledged as collateral security for the note which was dated May 19, 1955, due July 19, 1955, with interest at the rate of 3 per cent per annum The note was renewed on July 19 and August 18, 1955, by the execution of two additional notes. The Illinois Power bonds were cleared through the Chemical Corn Exchange Bank of New York and delivered to the Irving Trust Company, which held them for the account of the Gallun Corporation. On October 18, 1955, the bank sold the Illinois Power bonds for the Gallun Corporation at 98 1/2. All the purchases of the Louisiana Power and Light, Equitable Gas, Virginian Railway, Western Light & Telephone, and Illinois Power bonds were made pursuant to the plan outlined by Snell to Gallun. Snell provided Gallun with the basic information and research upon which this plan was based. This involved the market price of the bonds and the tax benefits *211 that could be obtained. A principal consideration in the purchase of these bonds was the fact that they qualified under the amortization deduction provisions of the Internal Revenue Code of 1939. Gallun also examined carefully the general background security and quality of the bonds which he and his corporation purchased. Snell and the Snell Company handled all of the purchases and sales of these bonds by Gallun, the Gallun Corporation, and the Gallun Foundation. Snell did not handle any other security transactions for them. At times he provided Gallun with forms of the necessary delivery instructions regarding these bonds. Gallun made all of the decisions regarding the purchase and disposition of these bonds both for himself and for the corporation after discussions with other officers of the corporation. He also controlled the sale of the bonds by the foundation. The bonds were purchased with the intention of transferring them by gift to charitable institutions. There was no intention to hold them until maturity. Gallun chose this form of making gifts for the purpose of minimizing his taxes and thereby increasing his ability to make gifts to charities. One of the factors considered *212 in determining the length of time for which the bonds were held was whether the time of the charitable donation thereof would result in the greatest tax advantage to the donor. The loans that were used to finance these transactions and for the payment of which the bonds were pledged as collateral were arranged by Gallun personally. Gallun would informally discuss the proposed loans with an officer at the bank and the amounts of the loans and the amounts that Gallun was to pay would be determined. During 1954 the market price of public utility bonds of this type was considered quite stable. The possibility that the premium paid for these bonds could be amortized and claimed as a deduction for Federal income tax purposes and that the bonds could then be donated to charitable institutions and a contribution deduction claimed for Federal income tax purposes was reflected in the purchase price of the bonds. During 1955 the price of this type of callable bond declined. This was attributable to two factors: "(a) The prevailing rate of interest increased making the yield on this type of bond less attractive for investment purposes. "(b) The publicity given the possibility that the *213 Internal Revenue laws would be changed to explicitly prevent deductions based upon their rapid amortization to call price and subsequent donation to charity." The Illinois Power bonds were sold by the Gallun Corporation rather than donated to a charitable institution because their price had declined. Gallun arranged for the immediate sale of the bonds that were transferred to the foundation. In the case of the Western Light & Telephone bonds transferred to the St. Mark's School and the Milwaukee Hospital, he advised immediate sale and guaranteed the institutions against loss for a period of 10 days. This was done because he did not believe that institutions of this type should deal in such equities but should convert them to cash as soon as possible. During 1954 R. G. Rankin & Co., a firm of certified public accountants, prepared from the accounts and records of the Snell Company schedules showing the amounts of amortization and contribution involved in each of the transactions between the Snell Company and Gallun and the Gallun Corporation for the period January 1 to December 10, 1954. This was done for tax purposes as an additional service for the customers of Snell Company. *214 On the joint Federal income tax return filed by Edwin A. and Jane W. Gallun for the taxable years 1954, page 3, they itemized the following deductions: Contributions
Milwaukee Hospital
$ 4,439.59
St. Marks School
4,439.59
Gallun Foundation, Inc.
28,743.24
Miscellaneous
Amortization of Bonds Pur-
chased
$42,875.00
On the Federal income tax return filed by the Gallun Corporation for the fiscal year ended September 30, 1954, Schedule H, a deduction is claimed for contributions to the Gallun Foundation in the amount of $15,460.51 and, Schedule J, for "Amortizations" in the amount of $37,762.33. On the Federal income tax return filed by the Gallun Corporation for the fiscal year ended September 30, 1955, Schedule H, a deduction is claimed for contributions to the Gallun Foundation in the amount of $12,870.03, and, Schedule J, for "Amortizations on Bonds" in the amount of $9,635.88. On the Federal income tax return filed by the Gallun Corporation for the fiscal year ended September 30, 1956, Schedule H, a deduction is claimed for "Contributions Carryover" in the amount of $13,634.86. The corporation, for the fiscal year ended September 30, 1955, was unable *215 to take full advantage of the charitable contribution deduction since its net income for that year prior to such deduction (as reflected in the return) was such that only a small part of the charitable contribution deduction could be utilized under application of the 5 per cent rule. This resulted in a carryover claim to fiscal 1956. Prior to the tax year 1954 neither of the petitioners had adopted a method for the amortization of bond premiums on bonds purchased. During the tax year 1954 each petitioner adopted a method of amortizing all of such premiums to the earliest applicable call date and at the lowest available call price. The taxpayers, therefore, claimed deductions from gross income for the amounts of the bond premiums paid by them in connection with their purchase of the various bonds described in the foregoing statements. The corporation, in the fiscal year ended September 30, 1955, received dividends from domestic corporations of $89,366.90. Its income before deductions was $538,773.13. Its standard deductions for the year plus 85 per cent of the dividends received exceeded the total income for the year. The taxpayer erroneously computed the dividends-received deduction *216 as $40,266.31, when it should have claimed $75,961.86. The Commissioner in auditing the return made the same error. Opinion KERN, Judge: After certain concessions made by respondent on the pleadings, there are presented two questions for our decision in these cases: (1) Whether petitioners are entitled, as a result of the transactions set forth in our findings of fact, to certain deductions claimed by them on account of bond-premium amortizations, [1] and (2) whether petitioners, as a result of the same transactions, are entitled to deductions claimed by them on account of charitable contributions. On the authority of Maysteel Products, Inc., 33 T.C. - (March 17, 1960); Fabreeka Products Company, 34 T.C. - (May 24, 1960), and Jack L. and Jean Sherman, 34 T.C. - (May 24, 1960), we decide the first question presented herein *217 for respondent and the second question in favor of petitioners. Decisions will be entered under Rule 50. Footnotes
1. In Docket No. 77038, by amendment to the petition, the corporation claims in the alternative with regard to the Illinois Power Company bonds that it is entitled to an increased capital loss deduction for its fiscal year 1956 if we hold that it is not entitled to a bond-premium amortization deduction. This alternative contention is conceded by respondent.↩